UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AXIS INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>GREAT AMERICAN INSURANCE COMPANY OF NEW YORK,<br><br>Defendant. | Case No.  22-cv-02315-AMO<br><br>**ORDER DENYING BOTH PARTIES'**<br>**MOTIONS FOR SUMMARY**<br>**JUDMGENT**<br><br>Re: Dkt. Nos. 54, 64, 90 |

This insurance coverage dispute involves two insurance parties: (1) AXIS Insurance Company ("AXIS"), the primary insurer for Twin Hill Acquisition Company ("Twin Hill"), a garment manufacturer, and (2) Twin Hill's excess insurer, Great American Insurance Company of New York ("Great American").  AXIS contends that it paid its applicable policy limits in connection with liability that Twin Hill incurred involving injuries resulting from uniforms it manufactured, and that Great American must now indemnify AXIS for money it spent in excess of its obligations and defend Twin Hill in underlying actions.  Great American, for its part, argues that AXIS did not exhaust its primary AXIS policies such that Great American's excess policies have not been triggered.

Pending before the Court are Plaintiff Axis Insurance Company's motion for summary judgment and Defendant Great American Insurance Company's cross-motion for summary judgment.  Having considered the parties' papers, the relevant legal authority, and the arguments advanced by counsel during the hearing on the matter, the Court **DENIES** both motions for the reasons below.

///

///

*United States District Court*
*Northern District of California*

I.      **BACKGROUND**

      A.      **Factual Background**

            1.      **Underlying Claims**

Twin Hill is a garment manufacturer that manufactured new uniforms for American Airlines (AA) employees pursuant to a 2015 contract. *See* AXIS RJN (Ex. 57),[1] Ex. 3.H (*Zurbriggen* TAC), Ex. 2 at 164; Geerdes Decl. (ECF 55-1) at 8. Bulk fabric production for the uniforms occurred from July to December 2015. Oliver Deposition (ECF 55-3) at 29. Plaintiffs in underlying lawsuits allege that as early as initial wear testing in March 2015, AA pilots reported that Twin Hill uniforms caused them to suffer skin and respiratory health issues. *Zurbriggen* TAC ¶¶ 140-42. In May 2016, ordering and shipping of Twin Hill uniforms for AA employees began. *Id.* ¶¶ 204-206; ECF 53-2 (6/22/2017 Letter) at 4. As of September 20, 2016, the "rollout date," all AA employees were required to wear the Twin Hill Uniforms. 6/22/2017 Letter at 4. Shortly after the rollout date, AA received thousands of complaints from employees about allergic reactions. AXIS RJN, Ex. 3.Q (12/21/2016 AFPA Grievance), Ex. 3.J (*Agnello* FAC) ¶¶ 12-13, Ex. 3.L (*Johnson* TAC) ¶¶ 12-13. By July 2017, the Association of Professional Flight Attendants ("APFA") reported it had received more than 3,000 complaints of health complications from reactions to the Twin Hill uniforms. *See Zurbriggen* TAC ¶ 378; G.A. RJN (ECF 63),[2] Ex. 9 (*Onody* Compl.) ¶ 82.

Hundreds of current and former AA employees have sued Twin Hill, alleging that they

---

[1] Axis seeks judicial notice of 16 exhibits, which constitute Form 10-Ks and Articles of Incorporation filed with the Securities and Exchange Commission, and court records from the underlying uniform actions. AXIS RJN (ECF 57) at 2-4. Great American does not object to the Court taking judicial notice of these exhibits. Courts may take judicial notice of facts that are "not subject to reasonable dispute." Fed. R. Evid. 201(b). Courts may take judicial notice of undisputed matters of public record, *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (citation omitted), publicly available financial documents such as SEC filings, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008), and documents on file in federal or state courts, *Harris v. Cty. of Orange*, 682 F.3d 1126, 1131-32 (9th Cir. 2012). Accordingly, the Court takes judicial notice of the exhibits submitted by Axis.

[2] Great American requests judicial notice of nine exhibits, which are court records from underlying uniforms actions. G.A. RJN (ECF 63) at 2-3. Axis does not object. The Court takes judicial notice of the exhibits. *See Harris*, 682 F.3d at 1131-32.

United States District Court
Northern District of California

have suffered a range of health consequences from wearing the uniforms provided to AA by Twin Hill.  AXIS RJN, *Zurbriggen* TAC, *Johnson* TAC, Exs. 3.I, 3.M-3.O.  Certain of the plaintiffs allege they experienced "proximity reactions" from being in the vicinity of someone else wearing a Twin Hill uniform, even if they themselves wore an alternative uniform.  *See Zurbriggen* TAC ¶¶ 12, 386-87, 402-71; *Onody* Compl. ¶¶ 51-73.  The complaints in these lawsuits (the "Underlying Uniform Claims") allege a variety of illnesses and diseases and refer to more than 20 separate chemicals used in the production and manufacture of Twin Hill's uniforms.  *See* G.A. RJN, Ex. 1 (*Zurbriggen* TAC) ¶¶ 162-68, 192-205; Ex. 2 (*Poole* FAC) ¶ 11; Ex. 3 (*Agnello* FAC) ¶ 11; Ex. 4 (*Hughes* SAC) ¶ 11; Ex. 5 (*Johnson* TAC) ¶ 11; Ex. 6 (*Macknochie* SAC) ¶ 11; Ex. 7 (*Wagoner* AC) ¶ 11; Ex. 8 (*Baker* Compl.) ¶ 9; Ex. 9 (*Onody* Compl.) ¶¶ 77-79.  Twin Hill used 14 different fabric mills to manufacture materials and 12 different factories in multiple countries to assemble the material into garments for AA uniforms.  *See Zurbriggen* TAC ¶¶ 114, 137, 139.

### 2.    Insurance Policies

AXIS issued five commercial general liability policies to Twin Hill for five consecutive annual periods from May 1, 2015, to May 1, 2020: the 2015-16 AXIS Policy, the 2016-17 AXIS Policy, the 2017-18 AXIS Policy, the 2018-19 AXIS Policy, and the 2019-20 AXIS Policy.  Mayer Decl. (ECF 62) ¶¶ 11-15, Exs. 9-13.  Each AXIS policy limits liability for "bodily injury" to $1 million per "occurrence," and $2 million in the aggregate.  *See id.*, Ex. 9 at 2, Ex. 10 at 2, Ex. 11 at 3, Ex. 12 at 2, Ex. 13 at 2; DeLonay Decl. (ECF 56) ¶ 6, Exs. 2.A-2.E.  The policies define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  DeLonay Decl., Ex. 2.A at 19.  The policies define "bodily injury" as "physical injury, sickness or disease sustained by a person, including death resulting from any of these; or the following when accompanied by physical injury, sickness or disease sustained by a person: mental anguish; shock; or emotional distress."  *Id.* at 84, Ex. 2B at 84; Ex. 2.C at 71.

The 2015-16 and 2016-17 AXIS Policies include an "AXIS Changes Endorsement" provision, which states that "all 'bodily injury' or 'property damage' arising from an 'occurrence' shall be deemed to occur at the time of the first such 'bodily injury' or 'property damage,' even

United States District Court
Northern District of California

though the 'occurrence' giving rise to such [injury] may be continuous or repeated exposure to the same general harmful conditions . . . [.]" Mayer Decl. ¶¶ 11-12, Ex. 9 at 22-23, Ex. 10 at 21-22. The provision also states that if AXIS renews or extends the policy, the most AXIS will pay for continuous or progressive injury that "first occurs or commences during the period of this policy, is the applicable annual limit of insurance stated in the declarations of this policy . . . regardless of whether such injury or damage continues into or occurs during any subsequent annual periods of this policy or any renewal policies issued by 'us.' " *Id.* The 2015 and 2016 policies also include a New York Changes Endorsement.  Mayer Decl. ¶¶ 11-12, Exs. 9-10.  The endorsement "modifies insurance provided under the following: Commercial General Liability Coverage Part" by "replac[ing]" paragraph 1 of Section I "Coverage A Bodily Injury and Property Damage Liability" with a different paragraph 1 that does not include the "deemer" or "anti-stacking" clauses. *Id.*, Ex. 9 at 37, Ex. 10 at 37.

The 2018-19 and 2019-20 AXIS Policies contain a self-insured retention ("SIR") of $250,000 per "occurrence" that applies to "damages, claims, or suits" arising from the Twin Hill uniforms manufactured for AA. *Id.* ¶¶ 14-15, Ex. 12 (AXIS007637) at 54, Ex. 13 (AXIS000779) at 53.

Great American issued three umbrella policies to Twin Hill from May 1, 2015 to May 1, 2016, May 1, 2016 to May 1, 2017, and May 1, 2017 to May 1, 2018.  DeLonay Decl. ¶ 4, Exs. 2.F-2.H.  Each Great American Policy has limits of $25 million per occurrence and $25 million in the aggregate.  *Id.*  The insuring agreements of the Great American Policies provide coverage for "those sums in excess of the 'retained limit' that the 'Insured' becomes legally obligated to pay as damages . . .  because of . . . 'bodily injury' or 'property damage that takes place; or 'personal injury' or 'advertising injury' arising from an offense committed [] during the Policy Period and caused by an 'occurrence' happening anywhere."  DeLonay Decl. ¶ 4, Ex. 2.F (GAIC000056) at 57, Ex. 2.G (GAIC000142) at 59, Ex. 2.H (GAIC000227) at 45.

### 3.    Insurance Claims and Settlements

On April 5, 2017, Twin Hill submitted a notice of claim to AXIS about the AA uniforms. DeLonay Decl. ¶ 5, Ex. 2.I.  AXIS acknowledged the claim and issued various position letters in

1    2017 and 2020, under which it agreed to defend Twin Hill under a reservation of rights.  *Id.* ¶ 7,

2    Exs. 2.K-2.M.

3          In July and August of 2022, AXIS settled claims involving some claimants and made

4    payments totaling $1 million.  *Id.* ¶ 9, Ex. 2.P.  On August 23, 2022, AXIS tendered the defense of

5    the uniform lawsuits to Great American, stating that the AXIS Policies were exhausted.  *Id.*  Great

6    American refused to accept that tender or fund Twin Hill's defense.  *Id.* ¶ 10.

7          **B.     Procedural Background**

8          On April 13, 2022, AXIS filed a complaint against Great American seeking declaratory

9    relief that all damages in the underlying litigation arise out of a single "occurrence" and AXIS's

10   applicable limits of liability were exhausted upon the $1,000,000 payment.  ECF 1 ¶¶ 31-38.

11   Great American responded to the complaint on May 11, 2022, and filed a counterclaim against

12   AXIS.  ECF 13.  On April 27, 2023, AXIS filed a motion for summary judgment.  ECF 54.  Great

13   American filed a cross-motion for summary judgment on May 11, 2023.  ECF 64.

14   **II.    LEGAL STANDARD**

15         **A.     Summary Judgment**

16         A court shall grant summary judgment "if . . . there is no genuine dispute as to any material

17   fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden

18   of establishing the absence of a genuine issue of material fact for trial lies with the moving party.

19   *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477

20   U.S. 317, 323 (1986)).  The court must view the evidence in the light most favorable to the

21   nonmoving party, and "draw[s] all justifiable inferences" in its favor.  *Fresno Motors, LCC v.*

22   *Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby,*

23   *Inc.*, 477 U.S. 242, 248, 255 (1986)).  A genuine factual issue exists if sufficient evidence favors

24   the non-movant such that "a reasonable [judge or] jury could return a verdict for the nonmoving

25   party."  *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000)

26   (quoting *Anderson*, 477 U.S. at 248) (alteration in original).  The court may not weigh the

27   evidence, assess the credibility of witnesses, or resolve issues of fact.  *City of Pomona v. SQM N.*

28   *Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting *Anderson*, 477 U.S. at 255).

United States District Court
Northern District of California

5

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must point to specific facts, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, showing that a genuine issue of material fact exists. *Devereaux*, 263 F.3d at 1076. More than a "scintilla of evidence" must exist to support the non-moving party's claims. *City of Pomona*, 750 F.3d at 1049 (quoting *Anderson*, 477 U.S. at 252). A showing that "there is some 'metaphysical doubt' as to the material facts at issue" will not suffice. *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *City of Pomona*, 750 F.3d at 1049-50 (quoting *Matsushita*, 475 U.S. at 587).

### B.    Insurance Contract Interpretation

As this is a diversity case, the Court applies California law to the interpretation of the insurance contract. *See Freeman v. Allstate Life Ins. Co.*, 253 F.3d 533, 536 (9th Cir. 2001); *see also* Cal. Civ. Code § 1646 ("[a] contract is to be interpreted according to the law and usage of the place where it is to be performed . . .").

Under California law, "interpretation of an insurance policy is a question of law that is decided under settled rules of contract interpretation." *State v. Continental Ins. Co.*, 55 Cal. 4th 186, 194 (2012) ("*Continental*"); *see Cort v. St. Paul Fire & Marine Ins. Companies, Inc.*, 311 F.3d 979, 982 (9th Cir. 2002). "While insurance contracts may have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." *Continental*, 55 Cal. 4th at 194 (citing *Bank of the W. v. Superior Ct.*, 2 Cal. 4th 1254, 1264 (1992)). "Such intent is to be inferred, if possible, solely from the written provisions of the contract." *AIU Ins. Co. v. Super. Ct.*, 51 Cal. 3d 807, 822 (1990). "If contractual language is clear and explicit, it governs." *Bank of the West*, 2 Cal. 4th at 1264. "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage,' [] controls judicial interpretation." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995) (quoting Cal. Civ. Code §§ 1638, 1644). California law

6

1    requires a "thorough examination of the policy language . . . [.]" *TRB Investments, Inc. v.*

2    *Fireman's Fund Ins. Co.*, 40 Cal. 4th 19, 27 (2006).

3    **III.    DISCUSSION**

4         AXIS and Great American both move for summary judgment regarding how many

5    occurrences led to bodily injuries over the five AXIS policy periods.  The practical financial

6    reason for this dispute is apparent.  If, as AXIS contends, the uniform injuries constitute one

7    "occurrence" and the deemer and anti-stacking provisions apply, the coverage obligation will fall

8    on Great American because Axis has satisfied its $1 million per-occurrence limit for the 2015

9    policy year.  If, as Great American contends, the injuries constitute more than one occurrence, and

10   the deemer and anti-stacking provisions do not apply, AXIS must exhaust its liability limits of $1

11   million per occurrence and $2 million in the aggregate in a policy period in which an occurrence

12   arose before the loss is transferred to Great American for the relevant policy period.

13        The parties largely agree that no material disputes of fact exist.  In their view, the

14   controversy lies in the proper interpretation of the AXIS policy language, and primarily turns on

15   defining "occurrence."  Accordingly, the Court first addresses the interpretation of "occurrence"

16   AXIS advances in its motion for summary judgment before turning to the interpretation Great

17   American advocates for in its cross-motion.

18        **A.    AXIS's Motion for Summary Judgment**

19        AXIS moves for summary judgment, arguing that the uniform-related injuries constitute a

20   single "occurrence" as a matter of law.  ECF 54 at 19-27.[3]  Under California law, an occurrence

21   "has generally been held to mean the underlying cause of the injury, rather than the injury or claim

22   itself . . . [.]" *Whittaker Corp. v. Allianz Underwriters, Inc.*, 11 Cal. App. 4th 1236, 1242-43

23   (1992) (citing cases).  "When there is a single cause of multiple injuries (or a number of causes

24   that result in a greater number of injuries), courts often look to the cause rather than the injuries in

25   determining the amount of insurance coverage.  In such a case, the result is a finding of only one

26

27   _____

     [3] The motion raises additional questions about the deemer and anti-stacking provisions which the
     Court does not reach in light of its ruling.

28

United States District Court
Northern District of California

claim, i.e., the court looks to the single cause rather than to the multiple injuries." *Safeco Ins. Co. of Am. v. Fireman's Fund Ins. Co.*, 148 Cal. App. 4th 620, 633 (2007) (citation omitted).  That is, "[w]hen all injuries emanate from a common source . . . , there is only a single occurrence for purposes of policy coverage.  It is irrelevant that there are multiple injuries or injuries of different magnitudes, or that the injuries *extend over a period of time*." *Id.* (citation omitted) (emphasis in original).  "Conversely, when a cause is interrupted, or when there are several autonomous causes, there are multiple 'occurrences' for purposes of determining policy limits and assessing deductibles." *Id.* at 633-34 (citation omitted).  Nonetheless, courts "must interpret the term 'occurrence' 'in context, with regard to its intended function in the policy." *London Mkt. Insurers v. Superior Ct.*, 146 Cal. App. 4th 648, 668 (2007) (quoting *EOTT Energy Corp. v. Storebrand Internat. Ins. Co.*, 45 Cal. App. 4th 565, 575 (1996).

AXIS argues that Ninth Circuit caselaw supports its argument that there was only one occurrence in this case.  It relies on *Chemstar, Inc. v. Liberty Mutual Ins. Co.*, 41 F.3d 429, 433 (9th Cir. 1994).  In that case, a plaster product that was unsuitable for interior use caused damage in twenty-eight homes.  *Id.*  The trial court found, and the Ninth Circuit agreed, that the underlying cause of all the damage was the manufacturer's failure to warn that the product was intended for exterior use only.  *Id.* at 432-33.  Thus, "the fact that the 28 incidents of pitting involved different homes, claimants, sources of lime, and times does not preclude a finding that the incidents arose from the same underlying cause." *Id.* at 433; *see also Champion Int'l Corp. v. Continental Cas. Co.*, 546 F.2d 502, 505-06 (2d Cir. 1976) (finding only one occurrence where sale of defective vinyl paneling to manufacturers of recreational vehicles resulted in 1400 damaged vehicles, because the "per occurrence" policy limit "was not intended to gauge coverage on the basis of individual accidents giving rise to claims, but rather on the underlying circumstances [that] resulted in the claim for damages"); *Mead Reinsurance v. Granite State Ins. Co.*, 873 F.2d 1185, 1187 (9th Cir. 1989) (eleven of twelve separate Section 1983 suits against municipality all resulted from a single municipal policy).

However, the definition of "occurrence" is not as clear-cut as AXIS would like.  When a cause is "interrupted" or there are "several autonomous causes" of injuries, courts have found

8

1   multiple "occurrences." *Safeco*, 148 Cal. App. 4th at 633-34 (citation omitted) (citing cases).

2   That is, courts focus on the "event or events causing the injury" to determine the number of

3   occurrences. *Id.* at 634. In *Evanston Ins. Co. v. Ghillie Suits.com, Inc.* ("*Ghillie*"), two Marines'

4   supposedly fireproof ghillie suits ignited on the same day in a related incident. No. C 08-2099 JF

5   (HRL), 2009 WL 734691, at *1-2 (N.D. Cal. Mar. 19, 2009). Although the incidents happened

6   close in time and were related, the court found two separate occurrences, as the first individual's

7   suit ignited from the discharge of his weapon, and the second individual's injuries resulted from

8   his attempt to rescue the first individual. *Id.* at *8-9. The court explained that while a

9   manufacturing defect may constitute a single occurrence where injuries "arise from a single

10  common cause," there was a distinct proximate cause of each individual's injuries. *Id.* at *9-11.

11  *Ghillie* reasoned that if the Marines' injuries were the "inevitable result of a defect in the ghillie

12  suits," for example, if the suits had been "treated with a chemical that caused burns upon skin

13  contact, such a scenario would favor application of the per-occurrence limitation in spite of

14  multiple injuries." *Id.* at *11 n.10.

15          This appears to be AXIS's theory. However, AXIS has not proffered any evidence as to

16  what defect (or defects) in the uniforms caused the numerous injuries. Although the uniforms

17  were all produced under the same contract, the Underlying Uniforms Claims allege that Twin Hill

18  used 20 separate chemicals, 14 different fabric mills, and 12 different factories to produce and

19  manufacture the uniforms. *Zurbriggen* TAC ¶¶ 137, 139, 162-68, 192-205; *Poole* FAC ¶ 11;

20  *Agnello* FAC ¶ 11; *Hughes* SAC ¶ 11; *Johnson* TAC ¶ 11; *Macknochie* SAC ¶ 11; *Wagoner* AC ¶

21  11; *Baker* Compl. ¶ 9; *Onody* Compl. ¶¶ 77-79. It is possible, for example, that uniforms

22  manufactured at some factories, during certain months, or using certain materials or chemicals,

23  had a distinct defect from that in uniforms manufactured at other factories or using different

24  chemicals.

25          Given the evidence before the Court, it cannot determine whether there were different

26  proximate causes of any of the injuries and cannot find at this time that there was only one

27  "occurrence" as a matter of law. *See, e.g.*, *Silgan Containers, LLC v. Nat'l Union Fire Ins. Co. of*

28  *Pittsburgh, P.A.*, No. C 09-5971 RS, 2014 WL 12640487, at *8 (N.D. Cal. July 30, 2014)

United States District Court
Northern District of California

1    (declining to reach summary judgment as to the appropriate number of occurrences related to

2    defective coating in tomato cans where the insurer "[m]erely characterize[ed] [one] aspect of the

3    chain of events as the ultimate and unitary 'cause,'" but the reason for the defective coating

4    remained unknown); *Ins. Co. of the State of Pennsylvania v. Cnty. of San Bernardino*, No.

5    EDCV160128PSGSSX, 2017 WL 3588244, at *6 (C.D. Cal. July 24, 2017) ("Where the facts are

6    in dispute, several California courts have left the determination of the number of occurrences –

7    which is essentially a question of proximate cause – to the jury") (citing cases); *cf. Safeco*, 148

8    Cal. App. 4th at 634 (a landslide causing residual damage over months was a single "uninterrupted

9    cause or event").

10       Accordingly, the Court denies AXIS's motion for summary judgment and now turns to

11   Great American's cross-motion.

12           **B.       Great American's Cross-Motion for Summary Judgment**

13       Great American cross-moves for summary judgment on its counterclaim for declaratory

14   judgment (ECF 13 at 14), arguing that the underlying uniform claims result from multiple

15   occurrences.  ECF 64 at 28.  It relies predominantly on *London Mkt. Insurers v. Superior Ct.*, 146

16   Cal. App. 4th 648 (2007).  *London Mkt.* involved the manufacturing of various asbestos products

17   that resulted in 24,000 claimants suffering bodily injury.  *Id.* at 652.  That court concluded that

18   under the specific facts of the case and the policy language at issue, "occurrence" did not mean the

19   "remote cause (manufacture of asbestos)," but rather the "immediate cause (exposure to asbestos

20   fibers)."  *Id.* at 667-69.  In *London Mkt.*, the policies defined "occurrence" as "an event, or

21   continuous or repeated exposure to conditions, which unexpectedly causes injury during the policy

22   period."  *Id.* at 662.  The court concluded that the parties intended "event" to mean "an

23   identifiable, single injury-causing episode," i.e., an "accident."  *Id.*  The court reasoned that based

24   on the plain meaning of the policy language, if the parties had intended for "event" to be construed

25   broadly (e.g., to include the "conscious inclusion of asbestos in products manufactured"), the

26   "continuous or repeated exposure" clause would be rendered superfluous.  *Id.*  Further, the court

27   considered that the manufacture and distribution of asbestos products over 30 years "cannot

28   reasonably be characterized as an 'event'" because it was ongoing conduct, and an intentional

United States District Court
Northern District of California

10

United States District Court
Northern District of California

1   business decision, as opposed to a single episode or accident. *Id.* at 662, 665.

2       Great American contends that the policy language and facts here are similar those in

3   *London Mkt.* ECF 64 at 40-42. The Court cannot agree. Here, unlike in *London Mkt.*, the

4   definition of "occurrence" is not written in the disjunctive and describes "continuous or repeated

5   exposure" as an example of an "accident." Thus, the policy here contemplates that an "accident"

6   could mean continuous or repeated exposure and not merely a single event. Moreover, the

7   manufacturing of the AA uniforms was tied to one contract over a 6-month period, and Great

8   American has not presented evidence showing that any defect was the result of an intentional

9   "business decision," as opposed to an accident in the manufacturing or distribution.

10      Ultimately, whether all the bodily injuries arise from a single occurrence or from multiple

11  occurrences will depend on whether there was one root cause of the injuries – something that may

12  be gleaned from the resolution of the underlying claims. *See Chemstar*, 41 F.3d at 432-33 (the

13  incidents all arose from the "same underlying cause" – the failure to warn). Here, AXIS has not

14  shown that there was one proximate, uninterrupted and continuing cause of all the injuries, and

15  Great American has not shown that the injuries arose from multiple causes. Instead, the parties

16  have highlighted that other material factual questions remain which preclude granting summary

17  judgment in favor of either party. Because the Court cannot determine at this time whether the

18  injuries resulting from the uniforms constituted one occurrence or multiple occurrences or whether

19  bodily injury resulting from any occurrences may be deemed to have occurred during the 2015-16

20  policy period, summary judgment is not warranted.

21  **IV.   CONCLUSION**

22      For the foregoing reasons, the Court **DENIES** both motions for summary judgment. The

23  Court will set a further Case Management Conference in the near term. The Court **DENIES** as

24  ///

25  ///

26  ///

27  ///

28  ///

premature Great American's administrative motion to file a second summary judgment motion.
ECF 90.  Further proceedings, including further motions practice, will be discussed at the case
management conference.

      **IT IS SO ORDERED.**

Dated: March 27, 2024

**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**